**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. _22-mj-02992-Otazo-Reyes_

IN RE: SEALED
CRIMINAL COMPLAINT

_____/

### CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?          No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?          No

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

BY:  _____

Kurt K. Lunkenheimer
Assistant United States Attorney
Court ID No.        A5501535
99 N.E. 4th Street
Miami, FL 33172
Tel: (786) 360-9771
Fax: (305) 530-7976
Email: Kurt.Lunkenheimer@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. 22-mj-02992-Otazo-Reyes |
| Ralph Steinmann | ) | |
| and | ) | |
| Luis Fernando Vuteff, | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___December 2014 to August 2018___ in the county of ___Miami-Dade___ in the

___Southern___ District of ___Florida___ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Sections 1956(h) | Conspiracy to Money Laundering |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Alan G. Vega, HSI
*Printed name and title*

Attested to in accordance with the requirements of
Federal Rule of Criminal Procedure 4.1 by _____

Date: ___6/12/22___

_____
*Judge's signature*

City and state: ___Miami, FL___

Hon. Alicia M. Otazo Reyes, US Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, ALAN G. VEGA, Special Agent with Homeland Security Investigations ("HSI"), having been first duly sworn, do hereby depose and state as follows:

**INTRODUCTION**

1.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code.  That is, I am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516(1).  I am currently assigned to the Financial Crimes Investigative Group of the Ft. Lauderdale, Florida Office.  I have received training and conducted investigations into financial crimes, to include money laundering.

2.      I have not necessarily included in the affidavit each and every fact known to me about the matters set forth herein, but only those facts and circumstances that I believe are sufficient to establish probable cause for the Court to authorize a criminal complaint.

3.      The statements in the affidavit are based upon my investigation, information provided by other individuals, including sworn law enforcement officers and confidential sources, and upon my experience and training as a federal agent and the experience and training of other federal agents.

4.      All dates, times, and amounts stated herein are approximate.  Quotation and summaries of recorded conversations are based on transcriptions with side-by-side Spanish-to-English translations or the actual Spanish-language recordings.  In reviewing the transcripts, I relied on both the translations and my knowledge of Spanish, as well as that of others.

5.      This affidavit is made in support of a criminal complaint charging defendants Ralph Steinmann and Luis Fernando Vuteff with conspiracy to knowingly conduct a financial transaction affecting interstate and foreign commerce, which financial transaction involved the proceeds of

1

specified unlawful activity, knowing the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that such transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(l)(B); all in violation of Title 18, United States Code, Sections 1956(h) and 1956(f). It is further alleged that the specified unlawful activity is: (a) a felony violation of the Foreign Corrupt Practices Act, in violation of Title 15, United States Code, Section 78dd-3, and (b) an offense against a foreign nation involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official.

### Defendant and Others Involved

6.    **Ralph Steinmann ("STEINMANN")**, a defendant, is a Swiss national who operated a European financial institution and is also affiliated with "European Company 1" in Spain.   STEINMANN was a money launderer associated with others described below, who assisted the conspirators and at least two Venezuelan public officials in concealing their illicit proceeds and gaining access to their illicit proceeds outside of Venezuela.

7.    **Luis Fernando Vuteff ("VUTEFF")**, a co-defendant, is an Argentinian national who was employed by STEINMANN at a European financial institution and also affiliated with "European Company 1" in Spain.   VUTEFF was a money launderer associated with others described below, who in part assisted the conspirators and at least two Venezuelan public officials in concealing their illicit proceeds and gaining access to their illicit proceeds outside of Venezuela.

8.    Francisco Convit Guruceaga ("Convit") is a Venezuelan national.   Convit, along with Conspirator 2, is often referred to as a "Bolichico" or member of the "boliburgues," a group

of well-connected Venezuelans with political and economic influence within the country. On August 18, 2018, Convit was charged in the Southern District of Florida in an indictment alleging one count of conspiracy to commit money laundering and two counts of foreign travel in aid of racketeering. *United States v. Francisco Convit Guruceaga, et al.*, 18-CR-20685, Dkt. No. 19 (S.D. Fla. Aug. 18, 2018). To date, Convit remains a fugitive. As described further below, Convit took actions in furtherance of the bribery scheme while in the territory of the United States in violation of the FCPA, Title 15, United States Code, Section 78dd-3(a). Convit, along with other conspirators, negotiated the bribe payments to public officials at Petróleos de Venezuela, S.A. ("PDVSA")[1] to obtain the favorable foreign currency loan contract that would allow the conspirators to leverage the difference between the Venezuelan controlled currency exchange rate and the black-market currency exchange rate. In addition, he was involved in carrying out the foreign currency exchange resulting in massive profits split amongst the conspirators and foreign officials.

9.    Jose Vincente Amparan Croquer, a.k.a., "Chente" ("Amparan"), is a Venezuelan national. Amaparan, along with VUTEFF, STEINMANN, and Hugo Andre Ramalho Gois, is associated with European Company 1 in Spain, a purported real estate firm, which he uses to launder money. Amparan also maintains relationships with "European Financial Institution 1" in Malta, a private investment firm, which he uses to launder money. On August 18, 2018, Amparan was charged in the Southern District of Florida in an indictment alleging one count of conspiracy to commit money laundering and two counts of foreign travel in aid of racketeering. *United States v. Francisco Convit Guruceaga, et al.*, 18-CR-20685, Dkt. No. 19 (S.D. Fla. Aug. 18, 2018). To

---

[1] PDVSA and its subsidiaries were "instrumentalities" of the Venezuelan government, and employees thereof were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-3(f)(2)(A).

date, Amparan remains a fugitive.  Amparan was a money launderer who assisted the conspirators and at least one Venezuelan public official in concealing their illicit proceeds and gaining access to their illicit proceeds outside of Venezuela.

10.     Hugo Andre Ramalho Gois ("Gois") is a Portuguese national.  Gois was brought into the money laundering conspiracy, along with VUTEFF and STEINMANN, by Amparan.  On August 18, 2018, Gois was charged in the Southern District of Florida in an indictment alleging one count of conspiracy to commit money laundering.  *United States v. Francisco Convit Guruceaga*, et al., 18-CR-20685, Dkt. No. 19 (S.D. Fla. Aug. 18, 2018).  To date, Gois remains a fugitive.  Gois was a money launderer who assisted the conspirators and at least one Venezuelan public official in concealing their illicit proceeds and gaining access to their illicit proceeds outside of Venezuela.

11.     Carmelo Antonio Urdaneta Aqui ("Urdaneta") is a Venezuelan national and former Legal Counsel to the Venezuelan Ministry of Oil and Mining.  On August 18, 2018, Urdaneta was charged in the Southern District of Florida in an indictment alleging one count of conspiracy to commit money laundering and two counts of foreign travel in aid of racketeering.  *United States v. Francisco Convit Guruceaga, et al.*, 18-CR-20685, Dkt. No. 19 (S.D. Fla. Aug. 18, 2018).  On July 14, 2021, Urdaneta pleaded guilty to a one count information charging him with conspiracy to commit money laundering, in part, for his role in the conspiracy alleged herein.  *Id.*, Dkt. No. 447 (S.D. Fla. July 14, 2021).  Urdaneta is scheduled to be sentenced June 15, 2022.  Urdaneta was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).  Urdaneta assisted his conspirators in creating the legal mechanism, a contract to provide PDVSA a loan in Venezuelan bolivars that would be paid out in euros and U.S. dollars,

for which the coconspirators could leverage the difference between the Venezuelan controlled currency exchange rate against the black-market currency exchange rate.

12.     Abraham Edgardo Ortega ("Ortega") is a Venezuelan national and former Executive Director of Finance of Venezuela's state-owned and controlled oil company, PDVSA. On August 18, 2018, Ortega was charged in the Southern District of Florida in an indictment alleging one count of conspiracy to commit money laundering and two substantive counts of money laundering. *United States v. Francisco Convit Guruceaga, et al.*, 18-CR-20685, Dkt. No. 19 (S.D. Fla. Aug. 18, 2018).   On October 31, 2018, Ortega pleaded guilty to a one count information charging him with conspiracy to commit money laundering, in part, for his role in the conspiracy alleged herein.  *Id.*, Dkt. No. 64 (S.D. Fla. Oct. 31, 2018).  Ortega was sentenced to 28 months' incarceration.  *Id.*, Dkt. No. 396 (S.D. Fla. May 5, 2021).  Ortega was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).  Ortega assisted his conspirators in ensuring that the financial division of PDVSA approved the currency exchange loan contract.

13.     Conspirator 1 is a Venezuelan national and a former PDVSA official. Conspirator 1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).  Conspirator 1 assisted his conspirators in ensuring that PDVSA approved the currency exchange loan contract, and he subsequently engaged Amparan, Gois, VUTEFF, and STEINMANN to launder his illicit proceeds received in exchange for that assistance.

14.     Conspirators 2 and 3, who are described further below, are additional uncharged members of the conspiracy.  Conspirators 2 and 3 are individuals associated with Convit and Conspirator 1.

15.     Conspirator 7 is a citizen and national of Venezuela, and a billionaire businessman who is an owner of Venezuelan television network.

16.     Venezuelan Official 1 is a foreign official as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

## PROBABLE CAUSE

### The Money Laundering Conspiracy

17.     The conspiracy in this case took place from in or about December 2014 until in or around 2018 with a currency exchange scheme involving approximately 600 million U.S. Dollars from PDVSA, obtained through bribery and corruption.  STEINMANN, VUTEFF and their co-conspirators were retained to launder a portion of the proceeds of that scheme (the "Bribery Proceeds"), including by coordinating the movement of funds with an individual who worked as a confidential source ("CS").

18.     The facts of the conspiracy set forth below are evidenced by electronic communications and documents, government records, financial records, recordings of phone conversations and in-person meetings, and CS and witness statements.

### Convit and Urdaneta Approach the CS

19.     Venezuela has a foreign-currency exchange system under which the government will exchange local currency (Bolívars) at a fixed rate for U.S. Dollars.  The fixed exchange rate has been well below the true economic rate by a substantial factor for several years.  For example, in 2014, the Venezuelan government's fixed exchange rate was approximately six Bolívars to one U.S. Dollar.  By contrast, the true economic exchange rate was approximately sixty Bolívars to

one U.S. Dollar.  The difference between the fixed rate and the true economic rate created opportunity for fraud and abuse.

20.    For example, in 2014, an individual could exchange 10 million U.S. Dollars for 600 million Bolivars at the true economic rate.  Then, if that individual had access to the government fixed rate, he could convert that same 600 million Bolivars into 100 million U.S. Dollars. Essentially, in two transactions, that person could obtain 100 million U.S. Dollars with only 10 million U.S. Dollars.

21.    In or about December 2014, Convit and Urdaneta approached the CS, prior to the CS working with law enforcement, with an offer for the CS to sell 100 million U.S. Dollars at a favorable Bolivar exchange rate, set by the Venezuelan government, and without the CS having to front the Bolivars for the transaction.

22.    The CS expected to receive a simple buyer-seller foreign exchange ("forex") contract to memorialize the agreement with Convit and Urdaneta.

23.    Over the course of the next month, in or about January 2015, Convit, Urdaneta, and the CS continued to discuss and facilitate the proposed forex transaction, often via BlackBerry Messenger chats and while Convit was present in the Southern District of Florida, according to U.S. travel and other records.[2]

24.    The CS instructed Convit to wire the funds from European Financial Institution 1 in Malta to an account belonging to a trust in the Bahamas, of which the CS was the ultimate beneficiary.  Convit agreed and informed the CS that the funds would arrive in Euros and not U.S. Dollars.

---

[2] According to these records, Convit arrived in the Southern District of Florida on December 20, 2014, and departed on January 18, 2015.

25.     By February 12, 2015, the CS had received approximately 78.8 million Euros into the trust from European Financial Institution 1 in four separate wire transfers beginning on January 14, 2015.

26.     Also, in or about February 2015, at the CS's request, Convit sent the CS a (PDF) document to justify the transfers between European Financial Institution 1 and the CS's trust.  The document Convit sent was a joint venture contract between a Hong Kong shell company, Eaton Global Services Limited ("Eaton")[3], and the CS's trust, purportedly signed by the CS's trustee. The CS had never seen this contract before and no such joint venture existed between the CS's trust and Eaton, nor did the signature on the contract belong to the CS's trustee.

27.     The CS requested the original underlying exchange contracts and Convit responded that Urdaneta had physical copies and would deliver them.  Days later in Venezuela, the CS received the documents in-person from Urdaneta, who explained that he obtained the documents from Conspirator 1, who as a PDVSA official was responsible, in part, for approving the documents.

28.     The documents Urdaneta gave to the CS show that the transaction was disguised as a "financing" arrangement, using the following three documents (provided by Urdaneta to the CS) (the "Eaton-Rantor Scheme"):

      a. First, a loan contract, dated December 17, 2014, between PDVSA and Rantor Capital C.A. ("Rantor"), a Venezuelan shell company, in which Rantor agreed to loan 7.2 billion Bolivars to PDVSA.  The loan contract was executed by "Venezuelan Official 1" as Vice President of PDVSA and was affixed with the PDVSA General Counsel Office's seal;

---

[3] A cooperating witness later provided law enforcement with information showing that this company was controlled by Conspirator 7.

b.  Second, an assignment contract, dated December 23, 2014, between Rantor and Eaton, in which Rantor assigns its rights as PDVSA's creditor under the loan contract to Eaton and in which PDVSA is given the right to cancel the debt within 180 days by paying 600 million U.S. Dollars; and

c.  Third, a notice of assignment letter, dated December 23, 2014, in which Eaton informs PDVSA (through Venezuelan Official 1) of the assignment and suggests that PDVSA repay the 7.2 billion Bolivar loan in the Euro equivalent of 600 million U.S. Dollars.  The letter included instructions for PDVSA to wire the funds to accounts at European Financial Institution 1 for the benefit of Eaton.

29.  Through these contracts, Eaton obtained the right to pay PDVSA approximately 7.2 billion Bolivars (worth approximately 35 million Euros in the non-government run exchange market) and receive approximately 510 million Euros, of which approximately 78.8 million Euros was sent to the CS.  Information provided by cooperating witnesses revealed that a portion of the 78.8 million Euros was going to be distributed to Urdaneta, Conspirator 1, and Venezuelan Official 1 as bribe payments for their roles in approving the loan contract.  Conspirator 1 was to receive approximately 15 million U.S. Dollars for his role as a PDVSA official in approving the loan contract described in paragraph 28(a), which included a seal from his office.

30.  In April 2015, the CS began making cash payments in Venezuela at Urdaneta and Conspirator 1's direction, including to Urdaneta, Conspirator 1, and Venezuelan Official 1, which ultimately would total over 1 million U.S. Dollars.

31.     In all, the CS conducted transactions totaling approximately 15 million Euros through the summer of 2015, including several U.S.-Dollar wire transactions at Conspirator 1's and the other conspirators' direction.[4]

### The CS Records Conspirator 1 and his Co-Conspirators

32.     Beginning in February 2016, the CS recorded conversations with Conspirator 1 and other conspirators, including STEINMANN but excluding VUTEFF, in which they explicitly acknowledged the money laundering conspiracy and underlying corruption. As evidenced by the following recordings, during this time, the CS worked with Urdaneta, Ortega, and Conspirator 1 to account for and distribute the Bribery Proceeds to themselves and others and to ensure that Amparan supplied additional fake contracts necessary to do so.

33.     In a February 19, 2016, recorded meeting with Urdaneta, the CS complained that the CS needed additional documents from Amparan. Urdaneta agreed and said that he would write to Amparan, Convit, and "Conspirator 2" to "bug them" about the contracts. Urdaneta also stated that they (Convit, et al.) are being "hit right now" by people in the "assembly" and joked that it is not a "piñata," a reference to corrupt Venezuelan officials requesting bribes from the co-conspirators. Urdaneta also stated that he would not go to the United States because the last time he was searched at the border and "they took away [his] phone. [And t]hank God [he] didn't have [his] phone, but a new phone."

34.     In a February 22, 2016, recorded meeting with Ortega, Ortega and the CS discussed how to move Ortega's money from the CS to Ortega. Conspirator 1 agreed to transfer a portion of his illicit proceeds from the Eaton-Rantor funds to Ortega as a bribe payment for his cooperation

---

[4] Based upon my training and experience, I know that international U.S.-Dollar wire transactions are routed and processed through banks located in the United States.

in a separate, prior joint-venture scheme. The CS explained that moving Ortega's bribe proceeds is not simple, and Ortega, regarding the source of his portion of the Bribery Proceeds, stated:

> So we can be frank and open with each other. Now. You know the origin of that. And that comes from . . . from something that is still making noise and it's still making noise and it's still making noise. It's going to explode one day. I mean, maybe not tomorrow, and also, it's not the . . . our friend, the leader in all this, he is everywhere every day.

35.     Ortega also acknowledged that Conspirator 1 assigned him a portion of the Bribery Proceeds and fretted aloud:

> It's all that shit they've been talking about, investigations and shit. Or the Americans going into all this, is that true? How far does that reach?

> But, how far could they get, in your opinion? If they get to the Swiss and they tell them, "I want, I want this information." Do they have to give it to them?

36.     Finally, the CS and Ortega walked through some account opening forms and discussed how Ortega could avoid declaring himself as a politically exposed person (also known as a "PEP") on bank KYC[5] documents.

37.     In a February 23, 2016, recorded conversation with "Conspirator 3" (Conspirator 1's relative), the CS explained that the CS's trustee is liquidating and "eventually there's a risk of the trustee checking the operation" and finding that the "the guys did a fake deal, falsifying the signatures of these guys who are there." The CS explained that the CS called Urdaneta and Conspirator 1 and told them that they have to set the documentation straight. The CS and Conspirator 3 also discussed a meeting in Caracas between the CS, Urdaneta, and Amparan about fixing the joint venture document described in paragraph 26, and Conspirator 3 noted that he has a "payment for [Venezuelan Official 1]."

---

[5] KYC is a banking/financial business abbreviation for "know your customer" which is short-had for knowing who your client is and the source of their monies to ensure that the financial institution is not holding or transferring illicit proceeds.

38.     In a March 7, 2016, recorded meeting with Urdaneta in Panama, the CS and Urdaneta recounted the receipt and expenditure of the Bribery Proceeds to date ("seventy-eight million eight hundred and something").  They recounted how much belonged to Conspirator 1 ("fourteen million five hundred forty thousand six hundred twenty-five") and other expenditures, including cash payments to Venezuelan Official 1, who authorized the underlying PDVSA loan agreement..  The CS recounted the cash kickbacks to Venezuelan Official 1 as follows:

> [Venezuelan Official 1], I gave him . . . to the boy he sent in one occasion two hundred thousand [200,000], June fourth [ 4th] and in another occasion one hundred thousand [100,000], on June twenty sixth [26th].

In the recorded meeting, Urdaneta agreed with the CS's accounting of the cash payments to Venezuelan Official 1.  Urdaneta explained to the CS that he did not want to leave a trail of "breadcrumbs" with respect to the accounts.

39.     During the same recorded meeting on March 7, 2016, Urdaneta again acknowledged Convit's involvement and Conspirator 1's arrangement with Ortega.  Conspirator 1 joined the meeting and discussed with Urdaneta and the CS the fake joint venture contract described in paragraph 26 and who was responsible for it.  Conspirator 1 then discussed how to divide up the Bribery Proceeds:

> Okay.  Let's start with an amount of [unintelligible] first.  First, I compensated one point three million [1,300,000] with Carmelo [Urdaneta] for a [unintelligible].  Then, from these eight, four, fifty [8,450] we, we would have seven, one hundred fifty [7,150] left.  Right?  This, I still have not written it down for you.  [unintelligible].  Then, these seven, one hundred fifty [7,150], we [unintelligible] with you and I gave you mine, I don't touch what belongs to Carmelo.  And from there I don't have anything to do with these one hundred fifty [150].  And he and I compensate some other way.  So, I don't have anything from this anymore.

40.     Importantly, at this meeting, Urdaneta and Conspirator 1 reviewed a spreadsheet of all the cash payments and expenditures created by the CS; each acknowledged the contents of the document, wrote notes on it, checked off transactions, and, ultimately, dated it.  The CS provided

a copy of this document to HSI-Miami with both Urdaneta and Conspirator 1's handwritten notes. Included on the spreadsheet are the kickback payments to Venezuelan Official 1 described in paragraph 37.

<u>STEINMANN and VUTEFF Involved With the Transfer of Funds For Urdaneta and Amparan</u>

41.    During the investigation, law enforcement obtained a September 2015 email from VUTEFF to Amparan and STEINMANN that included a spreadsheet documenting the distribution of the Eaton-Rantor Bribery Proceeds among the conspirators.  The spreadsheet contained different worksheets, including one labeled "SALIDA BOLI."  The "SALIDA BOLI" worksheet suggests that approximately €227,265,537.52 in Eaton Rantor proceeds were distributed to Convit and/or his Conspirators via transfers to entities controlled by Convit and/or his Conspirators.  Transfers made to, or for the benefit of, Urdaneta were also referenced in this worksheet.  The possession of this document shows that STEINMANN and VUTEFF participated in the laundering of the Bribery Proceeds and law enforcement continued to investigate their roles in the money laundering scheme, which included causing wire transfers of money from Europe into the Southern District of Florida.

42.    In or around mid-2016, at an in-person meeting, Amparan introduced Urdaneta to STEINMANN, VUTEFF, and Gois.  STEINMANN, VUTEFF, and Gois agreed to assist Urdaneta in gaining access to his illicit proceeds that were being controlled by the CS.  Further, Urdaneta provided his resume that included his role as a former government official to Amparan, STEINMANN, VUTEFF, and Gois and explained he was a former government official and that the source of his funds was bribery proceeds received while he was a government official.

43.    Amparan, STEINMANN, VUTEFF, and Gois assisted Urdaneta in concealing the nature, source and location of his Bribery Proceeds.  For example, Urdaneta attempted to gain

access to his Bribery Proceeds with STEINMANN and VUTEFF's involvement in the purchase and transfer of a Miami condominium ("Miami Condo").

44.     In a May 17, 2016, recorded call, Urdaneta discussed with the CS the transfer of the Miami Condo under the guise that the transfer was a fee for Amparan's money laundering services, when in fact Urdaneta wanted to gain access to money through the sale of the Miami Condo and encourage the CS to work with Amparan and others to launder the Bribery Proceeds in the CS' custody.  Previously, on or about January 24, 2013, Urdaneta, through his wife, had entered into a purchase agreement for the Miami Condo for approximately $5,300,000.00 USD.  From in or around February 2013 through in or around May 2013, Urdaneta caused the transfer of a total of approximately $1,590,000.00 USD in an escrow account for the purchase of the Miami Condo that was being constructed.

45.     Regarding the Miami Condo, on or about May 26, 2016, Paladium Real Estate Group, LLC ("Paladium") was established as a Florida limited liability company.  The articles of organization named Urdaneta's wife as a company manager.  On September 16, 2016, Amparan's relative was appointed as the sole manager of Paladium.

46.     On or about January 12, 2017, the title for the Miami Condo was transferred to Paladium via special warranty deed from the developer.  The remainder of the $5,300,000.00 purchase price of the Miami Condo, which totaled approximately $3,815,379.78, was paid through transfers from a foreign bank account controlled by Gois.  The wire transfers from Gois to close on the Miami Condo were made after VUTEFF sent an email to Gois, cc'ing STEINMANN, dated on or about January 9, 2017, with the wire transfer instructions and the total amount of money needed to be transferred to close on the Miami Condo.

14

47.     STEINMANN and VUTEFF caused a bank account controlled by Gois to wire transfer approximately $3,815,379.78 USD in four (4) separate wires into the Southern District of Florida as detailed below:

a. On or about January 13, 2017, a bank account controlled by Gois wire transferred approximately $1,239,945 USD to a closing agent trust account for the Miami Condo.

b. On or about January 18, 2017, a bank account controlled by Gois wire transferred approximately $659,950 USD to a closing agent trust account for the Miami Condo.

c. On or about January 18, 2017, a bank account controlled by Gois wire transferred approximately $228,350 USD to a closing agent trust account for the Miami Condo.

d. On or about January 19, 2017, a bank account controlled by Gois wire transferred approximately $1,087,189.78 USD to a closing agent trust account for the Miami Condo.

48.     Based on information from cooperating witnesses, the money used to complete the purchase of the Miami Condo came from STEINMANN, VUTEFF, and Amparan.  The money from Amparan came from an account he held at European Financial Institution 1.

49.     From in or about August 2016 through in or about September 2017, STEINMANN and VUTEFF directed wire transfers and were aware of wire transfers related to the Paladium Group and the Miami Condo, including sending wire transfers directly to the Southern District of Florida or through U.S. correspondent banks.

50.     Amparan and Urdaneta's efforts to launder the Bribery Proceeds continued from in or around 2016 until in or around 2018.

51.     Your Affiant is aware that Conspirators performed additional acts, including acts in the Southern District of Florida in order to launder the Bribery Proceeds, including transferring money into and out of the Southern District of Florida.

52.     In the second half of 2016, Urdaneta met STEINMANN, VUTEFF, and Gois in Madrid, Spain.  At that meeting, Urdaneta explained to the three of them the issues he was havingreceiving his funds from the CS.[6]  In addition, STEINMANN, VUTEFF, and Gois were informed by Urdaneta that he was the former Legal Counsel to the Venezuelan Ministry of Oil and Mining.  During the meeting, Urdaneta explained to STEINMANN, VUTEFF, and Gois that his money came from bribes he received while a Venezuelan government official.  STEINMANN, VUTEFF, and Gois proposed to Urdaneta financial structures and transactions, including a defaulting bond, that could assist him in obtaining his Bribery Proceeds.

53.     In a November 21, 2016, Blackberry Messenger ("BBM") chat, Amparan provided the details to the CS of the fraudulent bond purchase which was part of the defaulting-bond money laundering plan, and explained that the bond will be purchased through a U.K. broker-dealer.

54.     In a March 1, 2017, recorded meeting in Madrid, Spain, the CS met with Urdaneta, Amparan, STEINMANN, and Gois, at the offices of European Company 1, a real estate investment company that was also, in part, a front company supporting the money laundering.  En route to the meeting, Urdaneta is captured on the recording explaining to the CS that he should not be concerned about the fake joint venture contract and being caught because they only had to worry about the United States and the "Americans ... have no jurisdiction".  Urdaneta uses the word "launder" to describe their activities.  The purpose of the meeting was for the CS to gain comfort

---

[6] Urdaneta was having trouble receiving funds from the CS, in part, due to the fact that the CS was working with HSI as a confidential source.

with the "operation" proposed by Amparan.  STEINMANN and Gois were introduced to the CS as the managers of the operation and meant to comfort the CS, who had relayed misgivings about working with Amparan.

55.     During the meeting, Urdaneta explained to STEINMANN that there were some issues with documents presented to a bank (according to the CS, his signature was forged on a document provided to a bank) and that he wanted to "resolve that in the best way and, not let anyone ring any alarms on themselves about any suspicion," to which STEINMANN says "of course not."

56.     Also, during this meeting, Gois asked if there is anything he can tell the CS to make him more comfortable, and the CS noted that he was concerned about the U.K. broker-dealer because they asked "no question[s]" and had "no objection[s]" when an account was opened in the CS's name to purchase the fake bond.  Gois explained to the CS that there is no issue with the U.K. broker-dealer.  Amparan, Gois, and STEINMANN explained that they manage a fund which allows them to "generate payment structures, and third-party payments" . . . "with a very light KYC."  At the meeting, Amparan emphasized that they can make payments in "Miami, Panama, Europe."  The CS then asked, "And you have no issues paying in the United States?" and Amparan replied "no."  Gois explained that the CS should first buy a U.K. Treasury bond ("GILT"), then transfer it to an account in the CS's name at the U.K. broker dealer, and then it would be converted into the fake bond in order to affect the transfer on money to Urdaneta.

57.     On April 26, 2017, the CS, at the request of Gois and Urdaneta, purchased a 5-million-British-pound U.K. treasury GILT. On June 20, 2017, the CS, at the request of Gois ordered his bank, to "free deliver" the GILT to an account opened for the CS at the U.K. broker dealer. It was the CS' understanding that at the U.K. broker dealer, Gois would oversee an

operation to have the GILT exchanged for a separate worthless bond, so the funds could ultimately be transferred to and concealed for Urdaneta as Urdaneta would not be providing anything of value for the GILT.

58.     Thereafter, the CS, Gois, and Urdaneta continued to discuss the movement of the balance of Urdaneta's portion of the Bribery Proceeds through 2018, but no more funds were moved.  For example, the CS and Urdaneta spoke about aspects of the scheme on March 6, 2018.

59.     On October 11, 2017, Amparan sent Urdaneta an email cc'ing STEINMANN and VUTEFF.  In the email, Amparan explains the costs associated with certain transactions that Amparan, STEINMANN, and VUTEFF engaged in on behalf of Urdaneta.  In the email, Amparan explains that part of the reason that the costs were so high, was due to the "risk" involved in the transactions.  In addition, Amparan described how costs could be saved in a "future operation," which Urdaneta understood to mean his use of Amparan, STEINMANN, and VUTEFF's money laundering services.

60.     In a December 11, 2017, recorded meeting in the U.K., Gois explained to the CS how European Company 1 was the front company supporting the money laundering operation with the fake bond, and that Gois, Amparan, STEINMANN, and VUTEFF were the directors.  Gois also lamented about their criminal exposure, and advised the CS as follows:

> ...the faster you get out, the better for you.  Because if you... they're going to lock us all up.  That... I'm telling you, [CS], what do you want me to tell you?  That it's not like that?  It's the truth, there's going to be a day that they are going to lock all of us up; they are going to lock us up. This will be known.  [CS], I have no doubt.  I already saw where the shit comes from.  I saw where it comes from, how they're doing things, then in the end, whoever has the money is the one who is going to have problems.  The rest, well, he will have to defend himself, saying "Look, I got paid here." You'll defend yourself in your own way, I'll defend myself in the same way. But that will happen.

Conspirator 1's Interaction with STEINMANN, VUTEFF, and Amparan

61.     Conspirator 1, who also received monies for his involvement in the bribery scheme as discussed above, met with Amparan, STEINMANN, and VUTEFF in Europe in order to discuss gaining access to his portion of the Bribery Proceeds sometime in or around late 2016 or early 2017.   Urdaneta informed Conspirator 1 that Urdaneta had informed Amparan, STEINMANN, and VUTEFF about the true source of Conspirator 1's funds and that Conspirator 1 knew that Urdaneta used the services of Amparan, STEINMANN, and VUTEFF to launder Urdaneta's funds. For this reason, Conspirator 1 felt comfortable meeting with Amparan, STEINMANN, VUTEFF, and the others regarding his illicit funds.   At their first meeting, Amaparan instructed Conspirator 1 to trust STEINMANN and VUTEFF and to speak freely during the meeting.   This discussion was further evidence proving that STEINMANN and VUTEFF knew that Conspirator 1's funds came from bribes he received as a government official.   STEINMANN and VUTEFF were introduced as bankers and Conspirator 1 was told by STEINMANN that VUTEFF worked for STEINMANN.   The purpose of the meeting was to facilitate Conspirator 1 obtaining access and control of his portion of the Bribery Proceeds that were in the control of the CS.

62.     At the meeting, VUTEFF told Conspirator 1 that he and STEINMANN worked with a European Financial Institution 1 and shared with Conspirator 1 an email that VUTEFF sent to a high-level official at the European Financial Institution 1 concerning the account that the European Financial Institution 1 would establish for Conspirator 1 to obtain his illicit funds connected to the PDVSA loan scheme.   At the meeting, Conspirator 1 agreed that VUTEFF would directly handle the management of the funds in his account.

63. During the meeting, Conspirator 1discussed the Eaton Rantor Loan Scheme with STEINMANN and VUTEFF and explained how the scheme worked, including the details of the loan mechanism and currency exchange.

64. At the meeting, STEINMANN and VUTEFF decided that due to Conspirator 1's family wealth, a family account would be opened up for Conspirator 1 at a European financial institution to conceal the true nature of the funds deposited into the account.

65. During a meeting between Conspirator 1 and VUTEFF the day after Conspirator 1 met with Amparan, STEINMANN, and VUTEFF, VUTEFF asked Conspirator 1 about the  bribes that he made while working at PDVSA.  VUTEFF informed Conspirator 1 of various methods and means for him to gain access and control of his portion of the Bribery Proceeds, such as Conspirator 1 making real estate investments.

66. In or around approximately May of 2017, VUTEFF provided Conspirator 1 with documents for opening an account at the European Financial Institution 1.  VUTEFF assisted Conspirator 1 in filling out the account opening forms.  Some of the information in the forms were already filled out when the documents were provided to Conspirator 1.  In the paperwork, VUTEFF and/or others minimized Conspirator 1's work at PDVSA in that the answers to questions in the documents did not use the name "PDVSA," because VUTEFF told Conspirator 1 that using that name as a place where he worked in Venezuela would draw scrutiny.  Therefore, the document described Conspirator 1 as having worked at the State Oil Company of Venezuela and that he held a "technical position, not a top executive one."

67. Ultimately, STEINMANN and VUTEFF caused an account at the European Financial Institution 1 to be opened for Conspirator 1, and funds were placed into the account for Conspirator 1's benefit.

68.   In addition, STEINMANN and VUTEFF billed companies for work that they did for the true beneficiaries of those companies and the bills were paid through transfers from accounts held by Gois containing illicit proceeds to bank accounts under STEINMANN and VUTEFF's control and/or name.

69.   Conspirator 1's contact with VUTEFF continued into 2018 regarding the illicit funds in European Financial Institution 1 and Conspirator 1 was in contact with the CS on or about May 16, 2018, just a couple months prior to the indictment of Gois, Urdaneta, and other Co-conspirators in July 2018.

## CONCLUSION

70.   Based on the foregoing, probable cause exists to prove that, from in or around December 2014, through in or around August 2018,  in Miami-Dade County in the Southern District of Florida and elsewhere, defendants RALPH STEINMANN and LUIS FERNANDO VUTEFF, conspired with others to  knowingly conduct a financial transaction  affecting interstate and foreign commerce, which financial transaction involved the proceeds of specified unlawful activity, knowing the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that such transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(l)(B); all in violation of Title 18, United States Code, Sections 1956(h) and 1956(f).  It is further alleged that the specified unlawful activity is: (a) A felony violation of the Foreign Corrupt Practices Act, in violation of Title 15, United States Code, Section 78dd-3, and (b) an offense

against a foreign nation involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official.

Respectfully Submitted,

_____
ALAN G. VEGA, SPECIAL AGENT
HOMELAND SECUIRTY INVESTIGATIONS

Sworn and subscribed before me
this _____ day of June, 2022.

HON. ALICIA M. OTAZO REYES
UNITED STATES MAGISTRATE JUDGE

22